**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

**UNITED STATES OF AMERICA**            *

      **v.**                                   *

                            **Criminal No. RDB-19-0398**

**COLLIN DAVIS,**                        *

      **Defendant.**                        *

                       ...oOo...

## GOVERNMENT'S CONSOLIDATED OPPOSITION
## TO DEFENDANT'S PRETRIAL MOTIONS

Jonathan F. Lenzner
Acting United States Attorney

By:_____/s/_____
Patricia McLane
Lindsey McCulley
Assistant United States Attorneys
36 South Charles Street
Fourth Floor
Baltimore, Maryland 21201
(410) 209-4800

February 19, 2021

# TABLE OF CONTENTS

BACKGROUND.................................................................................................................3

STATEMENT OF FACTS .............................................................................................3

   A.   The Murder of Anthony Raynor on September 25, 2018...............................3

   B.   Arrest of Davis and Recovery of Two Firearms in Connecticut...................5

   C.   Davis's Voluntary Statement......................................................................6

   D.   Affidavit in Support of Historical Cell Site Information ..............................7

ARGUMENT ...............................................................................................................11

   A.   The Search Warrant for Davis' Historical Cell Site Information was Supported by Probable Cause.........................................................................................11

      1.   Legal Standard .................................................................................11

      2.   The Seizure Challenged in the Motion Was Supported by Probable Cause ...........13

      3.   The Agents Could Rely on Good Faith as Leon Applies ........................18

   B.   Davis's Statement Was Made After a Legal Arrest and a Voluntary and Knowing Wavier of His Rights Pursuant to Miranda.........................................................20

      1.   Legal Standard for Probable Cause to Arrest .......................................20

      2.   Legal Standard for Admissibility of a Statement...................................22

      3.   Analysis...........................................................................................24

         a. Law Enforcement had Probable Cause to Arrest Davis......................24

         b. Davis's Statement was Made Knowingly and Voluntarily..................24

   C.   The Firearms Are Intrinsic to the Case at Hand and Relate to Credibility.................25

      1.   Legal Standard .................................................................................25

      2.   The Firearms are Inextricably Intertwined with the Offenses Charged...................26

      3.   Possession of the Firearms Goes to Credibility, A Permissible 404(b) Purpose.......28

      4.   Evidence of the Firearms is Not Unfairly Prejudicial .............................28

CONCLUSION............................................................................................................29

The United States of America respectfully submits this consolidated response in opposition to the pretrial motions filed by the Defendant, ECF Nos. 33, 34 and 37. For the reasons explained below, the Court should deny these motions.

## BACKGROUND

On August 20, 2019, a federal grand jury for the District of Maryland returned an indictment charging Collin Davis with carjacking resulting in death in violation of 18 U.S.C. § 2119(3), § 924(j) (Count One); conspiracy to possess with intent to distribute controlled substances in violation of 21 U.S.C. § 846 (Count Two); and discharging a firearm during and in relation to a crime of violence and a drug trafficking crime in violation of 18 U.S.C. § 924(c) (Count Three).[1] *See* ECF No. 1. The Court set a motions hearing for June 22, 2021. Davis filed three pretrial motions—two suppression motions, and one motion *in limine*—with approval to file additional motions prior to trial. *See* ECF Nos. 33, 34, 37, 38, and 40.

## STATEMENT OF FACTS

### A.  The Murder of Anthony Raynor on September 25, 2018

On September 25, 2018, at approximately 8:45 p.m., Anthony Raynor drove to Curtis Bay in Baltimore City to meet with Collin Davis. Three hours later, Davis murdered Raynor.  Davis, and possibly one other, tied Raynor to the passenger seat of Raynor's own vehicle, attempted to slit his throat and shot him. Raynor died because of the gunshot wounds.

A late-night worker saw a silver four-door Chevrolet (Raynor's vehicle) drive by his work site shortly before midnight and park in the 5100 block of Curtis Avenue. He heard an argument coming from the parked car, followed by a muffled gunshot and a second, louder gunshot. He then

---

[1] The Government shall amend Count Three prior to trial to reflect only the crime of violence (carjacking) theory pursuant to *United States v. Davis*, 139 S. Ct. 2319 (2019).

witnessed an individual pulling a body out of the car and leaving the body in the street. The individual returned to the car (not in the driver seat) and the car drove from the site. The witness called 911.

Officer Perry arrived at the grisly sight; Raynor's body with four bullet wounds and stripped of any identifying information. There was no vehicle at the scene. Twenty-four hours later, investigators located Raynor's vehicle mere blocks away, parked in an alley on Spruce Street, steps away from an apartment where Davis had lived with his sister until being evicted on September 19, 2018. Investigators recovered a bloody ligature and swabbed the vehicle for DNA. Later, agents executed a federal search warrant for Davis's DNA and compared the swabs in the vehicle and ligature. Davis's DNA was found on the ligature used to tie up Raynor and on the steering wheel of Raynor's vehicle.

Raynor's family members told investigators that several items including containers (allegedly full of weed), a small handgun or revolver, and a shotgun were missing from Raynor's basement apartment. The family also provided phone numbers for Raynor, which investigators used to develop the number of a suspect who had many phone contacts with Raynor the day of his murder, later identified as Davis.  A federal historical cell site search warrant provided routes of travel for Davis's phone number (443-694-0725) and Raynor's phone number (410-855-2369). Special Agent Matt Wilde, FBI, produced cell site mapping depicting Raynor's phone leaving Severn, Maryland (where Raynor lived) on September 25, meeting up with Davis's phone in Curtis Bay, and both phones traveling from Curtis Bay back to Raynor's house in Severn. The map also depicts the phones returning to Curtis Bay. A license plate reader in Curtis Bay also captured Raynor's vehicle on three occasions that night: coming in at 8:45 p.m., leaving at 9:10 p.m., and

returning at 11:43 p.m. (right before Davis murdered him). The cell site mapping also shows that Davis' phone left Curtis Bay and went to Pasadena, Maryland around 1:30 a.m. after the murder.

Phone records show that Raynor's phone is not accessed after his death on September 25, 2018; investigators never recover Raynor's phone. Further, phone records show that Raynor and Davis contacted each other 18 times on September 25, 2018, before Raynor met with Davis. They had four more contacts after Raynor entered Curtis Bay on 8:45 p.m. Raynor's only contact on his phone from the time he entered Curtis Bay until his death, was Davis, except for one text message to Raynor's brother around the time Raynor and Davis travelled to Raynor's house.

### B. Arrest of Davis and Recovery of Two Firearms in Connecticut

Investigators did not apprehend Davis until November 2018; they spent a month chasing Davis up and down the East Coast until finding him in a small one-bedroom apartment in Connecticut. Another individual, A.R., leased the apartment and allowed Davis and two females to stay there. Agents executed a federal search warrant on A.R.'s apartment and recovered a Hatsan Arms Model Escort caliber 12-gauge shotgun inside a closet, and a Smith & Wesson Model 19-3, .357 caliber revolver loaded with four rounds of ammunition, in a locked safe.[2]

A.R. and the other occupants of the apartment denied both knowing about and possessing the firearms. Forensic evidence developed during the investigation found Davis's DNA was found on both firearms; however, a forensic comparison with the ballistics found at the murder scene revealed that the revolver was not the murder weapon. Raynor's family and other witnesses told investigators that Raynor had a small handgun and/or revolver, and a shotgun. His family also told investigators that firearms were missing from Raynor's basement room. Agents searched Davis's phone recovered during his arrest. They found evidence that Davis tried to sell the revolver after

---

[2] District of Connecticut Magistrate Judge Robert Spector authorized the warrant on November 19, 2018.  *See* 3:18 mj 1897 (RMS).

he arrived in Connecticut, amongst other photographs and data useful to the investigation.[3] *See* Gov't Exh. A.

### C.  Davis's Voluntary Statement

Agents arrested Davis in Connecticut on November 19, 2018, on a violation of parole warrant from New York State. *See* Gov't Exh. B.[4] Davis was transported to the New Haven Police Department where Task Force Officer ("TFO") Bryan Kershaw orally advised Davis of his *Miranda* rights. The entire interview, including the *Miranda* portion, was recorded. *See* Gov't Exh. C.[5] TFO Kershaw read from a written *Miranda* form, and Davis orally agreed that he understood each right. *Id.* at 4:34. At no time before or during questioning did Davis request counsel or invoke his right to silence or his right to have counsel. At no time before or during questioning did Davis express or exhibit behavior consistent with being unable to understand TFO Kershaw or SA Cheplak who joined the questioning after the *Miranda* rights were administered. Similarly, at no time did Davis express or imply that he did not understand TFO Kershaw's vocabulary or meaning when TFO Kershaw read Davis's *Miranda* rights. On the contrary, Davis's clear acknowledgement of understanding each right as captured on video reflect his voluntary decision to waive his rights and talk to investigators.

TFO Kershaw told Davis the basis for his arrest but that he and SA Cheplak wanted to discuss Raynor's murder. *Id.* at 5:15. Davis confirmed his phone number at the time of the murder.

---

[3] District of Maryland Magistrate Judge Gesner authorized the search of Davis's phones on February 25, 2019.  *See* 19-515-BPG.

[4] Davis was sentenced to eight years imprisonment for CPW-2nd: Loaded Firearm with five years post-release supervision and one-year imprisonment for Resisting Arrest.  *New York v. Colin Davis*, Supreme Court, County of Queens, 00921-2009. His supervision was transferred to Maryland on or about August 5, 2016. An absconder violation report was filed November 7, 2018 after Davis failed to report on two occasions and dropped his phone number.

[5] The times referenced in this Motion refer to the bottom number on the video, not the top clock number.

*Id.* at 16:30. He also admitted meeting with Raynor the night he died to purchase drugs. *Id.* at 18:20. Davis describes Raynor's car as silver. *Id.* at 27:13. Davis initially told investigators that he stayed in Curtis Bay all night after meeting Raynor, but when confronted by the historical cell-site mapping, he changed his story and said he went to visit a friend in Anne Arundel County. *Id.* at 28. He admitted to sitting in Raynor's car the night of the murder but said he both drove his own silver car out of Curtis Bay and took a hack (a driver for money) out of Curtis Bay. *Id.* at 35:08 – 39:10.

Davis denied knowing about the firearms or possessing them. *Id.* at 57:20, 1:07:00, 1:09:05. Davis admitted to violating his Maryland probation when he stopped reporting to his agent after a disagreement. *Id.* at 59:05–1:03:00. Davis denied any involvement in Raynor's murder. *Id.* at 1:09:46.

The interrogation ended after approximately an hour. The agents continued to monitor the recording camera after the interview. They saw Davis take a key out of his wallet and attempt to swallow it. *Id.* at 1:13:00-:42. The agents made Davis cough up the key. *Id.* at 1:13:52. The key read "Century Safe". *Id.* at 1:14:56. Agents later confirmed the key Davis tried to swallow opened the safe where officers found the revolver. This, plus evidence found on Davis' phone showing he tried to sell the revolver, and that Davis also had a shotgun, suggests that the revolver and shotgun in Davis' possession were the ones that went missing from Raynor's basement bedroom.

### D.  Affidavit in Support of Historical Cell Site Information

As stated above, investigators obtained a warrant for historical cell site information pertaining to Raynor's phones and Davis' phone.  Davis challenges that warrant as lacking probable cause.  The following are the facts used in that warrant to establish probable cause. Gov't Exh. D, at ¶ 10. The affidavit lays out the circumstances surrounding Raynor's death, including referencing a witness to the crime, who said he observed a silver sedan pull over on Curtis Avenue

shortly before midnight. *Id.* at ¶ 11. He saw movement of multiple individuals within the vehicle on both the passenger and driver side. *Id.* He also heard the doors of the vehicle open and slam shut multiple times as if someone was trying to get out. *Id.* He then saw the vehicle continue northbound a short distance before it stopped a second time. *Id.* He then heard multiple gun shots, the first shot was muffled and the second one was loud. *Id.*

Investigators obtained surveillance footage from the area and observed a silver sedan driving on Curtis Avenue shortly before the time that Raynor's body was found on the street. *Id.* Investigators showed the footage to Raynor's family members, who confirmed it was his vehicle. *Id.* at ¶ 12. The family members also stated that they knew he had been driving that vehicle around 6 p.m. on September 25, 2018. *Id.* A family member also provided investigators with two cellular telephone numbers that Raynor's used. *Id.*

Investigators identified other evidence of where Raynor's vehicle had been. They found a license plate reader approximately one mile from the location of Raynor's body. *Id.* at ¶ 13. Investigators queried Raynor's vehicle tag and learned that the vehicle passed by that license plate reader at 8:45 p.m., 9:10 p.m., and 11:43 p.m., on the night Raynor was killed. *Id.* After that time, the vehicle never left Curtis Bay. *Id.*

Investigators found Raynor's vehicle the day after he was killed. *Id.* at ¶ 14. It was in an alleyway approximately 0.6 miles away from where Raynor's body was discovered. *Id.* They obtained a search warrant for the vehicle from a judge on the District Court of Baltimore City. *Id.* n.7. The vehicle contained a bullet hole in the rear passenger side, suggesting that someone was shot in the vehicle and corroborating the witness who said that he heard a muffled shot and then a louder shot. *Id.* at ¶ 14. Investigators also recovered blood and a torn bloody t-shirt that had been

tied into knots. *Id.* Believing it could contain the DNA for whomever killed Raynor, they swabbed the t-shirt for DNA. *Id.*

Investigators identified a confidential informant, who the investigators referred to as CS-1. *Id.* at 15. This informant agreed to provide information about the incident without gaining anything in return. *Id.* n.8. He/She was simply doing their civic duty, and he/she did not have a criminal record. *Id.* CS-1 told investigators that the Defendant, Collin Davis, was an associate of Raynor's that lived close to where Raynor was killed. *Id.* at ¶ 15.

Investigators corroborated the information CS-1 provided. They reviewed data from several credit monitoring services that showed that Davis had, in fact, resided at 1623 Spruce Street. *Id.* Not only was this residence about a mile from where Raynor was killed, but the back of the residence was adjacent to where Raynor's vehicle was recovered. *Id.* They also learned from these credit monitoring services that Davis had lived at that residence for several months in 2018, the same year Raynor was murdered. *Id.*

Investigators talked to a second confidential informant, who they identified as CS-2. *Id.* at ¶ 15. Again, CS-2 told investigators what he/she knew without gaining anything in return. *Id.* n.9. He/She was simply doing their civic duty, and he/she did not have a criminal record. *Id.* Investigators showed him/her photographs of Davis and his sister, and CS-2 identified them as prior residents of 1623 Spruce Street. *Id.* CS-2 said the two had been evicted from that residence in October 2018. *Id.* CS-2 also identified a red Honda Accord with a specific license plate number as a vehicle that Davis drove. *Id.*

The investigators corroborated CS-2's information. They identified that the red Honda Accord was registered to Davis' mother. *Id.* n.10. They also found police records showing that Davis was stopped in that vehicle as recent as August 2018. *Id.* Investigators also looked at license

plate reader data that showed that Honda Accord was parked in front of 1623 Spruce Street as recent as July 2018, two months before Raynor was murdered. *Id.* at ¶ 15.

The investigators learned that Davis was on probation for a 2008 firearms conviction in New York State, and contacted his probation officer.[6] *Id.* at ¶ 16. From the probation officer's file, investigators confirmed once again that Davis was living at 1623 Spruce Street even though he had a different address of record. *Id.* Investigators also found, in the probation officer's file, a phone number for Davis. *Id.* Investigators looked at Howard County police reports showing that officers from Howard County had contacted Davis on that same phone number on multiple occasions relating to a domestic dispute between his daughter and her mother. *Id.* n. 12.

Investigators had now corroborated CS-1's and CS-2's information about where Davis had lived through credit reporting services, license plate reader hits placing his car in that area, and his probation officer's file indicating that he lived there.   Investigators also corroborated CS-2's information that Davis drove a specific car through registration records, the license plate reader hits, and prior police records where he was stopped in the vehicle.

Knowing two numbers Raynor used and a number Davis used, investigators looked at Raynor's call detail records for September 25, 2018. *Id.* at ¶ 17. One of Raynor's phone number exchanged 42 text messages with Davis' phone number between 3:45 p.m. and 8:49 p.m.[7] *Id.* With

---

[6] *See* Footnote 4.

[7] At the time Agent Cheplak drafted the warrant, he believed Raynor and Davis had 42 contacts the day of Raynor's murder. Later in the investigation, Agent Cheplak learned the program used by the ATF analyst double-counted the contacts. The actual number of contacts between Raynor and Davis on the day of Raynor's death was 22. This mistake does not impact whether the warrant had sufficient probable cause because the law contemplates that affiants will sometimes get things wrong: "This does not mean 'truthful' in the sense that every fact recited in the warrant affidavit is necessarily correct, for probable cause may be founded upon hearsay and upon information received from informants." *Franks v. Delaware,* 438 U.S. 154, 165 (1978). As the Court in *Franks* acknowledges, the information "sometimes must be garnered hastily."   *Id.*   Rather, *Franks* examines whether the information "is believed or appropriately accepted by the affiant as true."

this information, investigators had corroborated the last piece of information from CS-1 that Raynor and Davis were associates. What's more, investigators now had evidence that Davis and Raynor exchanged numerous texts up until 8:49 p.m. the day Raynor was murdered, that Raynor's car hits on a license plate reader close to the area where Davis lived at 8:45 p.m., 9:10 p.m., and 11:43 p.m. (suggesting that Raynor and Davis were together because the cell phone contact stopped and Raynor's vehicle went to the area where Davis was known to have lived), that Raynor is then shot about a mile from where Davis lived, and that his car was found adjacent to the back of the house where Davis had lived.

## ARGUMENT

### A. The Search Warrant for Davis' Historical Cell Site Information was Supported by Probable Cause.

The search warrant for Davis' historical cell site information was replete with unarguable facts, and corroboration of the two confidential sources (CS-1 and CS-2), which provided sufficient probable cause for Magistrate Judge Coulson to issue the warrant. The Court should deny the motion because the search complied with the Fourth Amendment.

### 1. Legal Standard

The Fourth Amendment protects all people against unreasonable searches and seizures and requires that all warrants authorizing a search or seizure must be supported by probable cause. U.S. Const. Amend. IV; *United States v. Perez*, 393 F.3d 457, 460 (4th Cir. 2004). Probable cause

---

*Id.* The Fourth Circuit has repeated this same principle: "*Franks*, by contrast, recognizes that the information an affiant reports from an informant may not ultimately be accurate, and is willing to tolerate such a result so long as the affiant did not mislead the magistrate." *United States v. Colkley*, 899 F.2d 297, 303 (citation omitted). Here, regardless of the actual number of contacts, Davis had numerous contacts with Raynor in the hours before his death, and Davis was the last person Raynor had contact with absent one text to Raynor's brother the evening before he died.

is "a flexible standard that simply requires 'a reasonable ground for belief of guilt' and 'more than bare suspicion.'" *United States v. Ortiz*, 669 F.3d 439, 444 (4th Cir. 2012) (quoting *Brinegar v. United States*, 338 U.S. 160, 175 (1949)). The "standard" of "'reasonable ground for belief of guilt' requires less of a showing than does the formal preponderance-of-the evidence standard." *Ortiz*, 669 F.3d at 444-45 (citing *Illinois v. Gates*, 462 U.S. 213, 235 (1983)). This probable cause analysis is a "commonsense, practical question." *Gates,* 462 U.S. at 230; *United States v. Blackwood*, 913 F.2d 139, 142 (4th Cir. 1990). "[P]robable cause is a fluid concept--turning on the assessment of probabilities in particular factual contexts--not readily, or even usefully, reduced to a neat set of legal rules." *Gates,* 462 U.S. at 232.

Probable cause may be established through information provided by any reliable source or sources. *Draper v. United States*, 358 U.S. 307, 313 (1959). It is well settled that probable cause may be founded upon hearsay and information received from informants. *Franks,* 438 U.S. at 165. Although officers are not required to corroborate an informant's tip, the extent of corroboration is an important factor when assessing the informant's reliability. *United States v. DeQuasie*, 373 F.3d 509, 518–19 (4th Cir. 2004); *see also United States v. Lalor*, 996 F.2d 1578, 1581 (4th Cir. 1993) ("Corroboration of apparently innocent details of an informant's report tends to indicate that other aspects of the report are also correct.").

Indeed, when a confidential source's information is sufficiently corroborated by the police, the affidavit does not need to include statements to support the reliability of an informant. *United States v. Varner*, 261 Fed. App'x 510, 516 (4th Cir. 2008). And "[t]he officer applying for the warrant need not entirely eliminate the risk that an informant is lying or in error." *Perez*, 393 F.3d at 462 (citation and internal punctuation omitted).

In determining whether a judicially authorized search warrant is valid under the Fourth Amendment, the reviewing court must evaluate whether the magistrate had a substantial basis for concluding that probable cause existed. *See Blackwood*, 913 F.2d at 142; *United States v. Williams*, 974 F.2d 480, 481 (4th Cir. 1992). A judicial officer's determination that there is probable cause to issue a search warrant is a "practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Montieth*, 662 F.3d 660, 664 (4th Cir. 2011) (quoting *Gates*, 462 U.S. at 238). In doing so, a "magistrate has the authority … to draw such reasonable inferences as he will from the material supplied to him by applicants for a warrant." *United States v. Bynum*, 293 F.3d 192, 197 (4th Cir. 2002) (quoting *Gates*, 462 U.S. at 240). A reviewing court should give great deference to an issuing judicial officer's decision to issue a warrant based on the facts before him. *Montieth*, 662 F.3d at 664 (citations omitted); *Blackwood*, 913 F.2d at 142.

The Supreme Court has "specifically cautioned against 'hyper technical' scrutiny of affidavits lest police officers be encouraged to forgo the warrant application process altogether." *United States v. Robinson*, 275 F.3d 371, 380 (4th Cir. 2001). The probable cause standard does not "require officials to possess an airtight case before taking action. The pieces of an investigative puzzle will often fail to fit in neatly, and officers must be given leeway to draw reasonable conclusions from confusing and contradictory information." *Taylor v. Farmer*, 13 F.3d 117, 121 (4th Cir. 1993).

### 2.  The Seizure Challenged in the Motion Was Supported by Probable Cause

In this case, the Affidavit in Support of Application for Search Warrants (the "Affidavit") contained sufficient information that evidence of carjacking and use of a firearm in furtherance of

13

a crime of violence would be found in the historical cell site information from Davis' phone on September 25, 2018 because it was likely to place Davis with the victim, Raynor, at and leading up to the time he was murdered. To that end, the Affidavit contained reliable information that Davis and Raynor knew each other and exchanged numerous texts messages up until 8:49 p.m. the day Raynor was murdered, Raynor's car hit on a license plate reader close to the area where Davis lived at 8:45 p.m., 9:10 p.m., and 11:43 p.m. (suggesting that Raynor and Davis were together because the cell phone contact stopped when Raynor's vehicle went to the area where Davis was known to have lived), Raynor was then shot and killed about a mile from where Davis lived, and his car was found the next day adjacent to the house where Davis lived.

In attempting to claim a lack of probable cause in the Affidavit, Davis relies almost exclusively on *United States v. Wilhelm*, 80 F.3d 116 (4th Cir. 1995). In *Wilhelm*, the affidavit in support of the search warrant relied on an anonymous phone caller's tip that the caller had recently observed marijuana sales in Wilhelm's residence. The officer did not know the caller's name or any other identifying information, and he never met with the caller in person.   The affidavit in *Wilhelm* failed to provide information as to the source's reliability or veracity, merely stating that the source is a "mature" and "concerned citizen...with personal connections with the suspects" and has a "truthfull [sic] demeanor." *Id*. The only corroboration the police provided in the *Wilhelm* affidavit were directions to the suspect's home and a general description of the alleged marijuana. *Id*. at 121. The court found that the informant's tip was too vague because "almost anyone can give directions to a particular house without knowing anything of substance about what goes on inside that house, and anyone who occasionally watches the evening news can make generalizations about what marijuana looks like and how it is packaged and sold." *Id*. As a result, the court held that the search warrant was not supported by probable cause. *Id*.

14

*Wilhelm* is inapposite to this case for many reasons. First, despite Davis' contentions, the confidential sources in this case were not "anonymous."[8]  The Affidavit sets forth facts showing that the investigators knew the identities of the informants.  It notes that the investigators showed pictures to one of the informants, meaning that the meeting was in person.  This is an important distinction to make because an "informant who meets face-to-face with an officer provides the officer with an opportunity to assess his credibility and demeanor and also exposes himself to accountability for making a false statement." *DeQuasie*, 373 F.3d at 523.  And "courts have had no difficulty distinguishing between cases involving face-to-face encounters with informants and cases involving anonymous tipsters." *United States v. Christmas,* 222 F.3d 141, 144 (4th Cir. 2000).

Second, Davis' argument ignores that the Affidavit shows the investigators in this case were able to corroboration each fact that they had learned from confidential sources. Instead of focusing on the corroboration, Davis takes issue with the lack of a statement in support of the informant's reliability. But reliability can be shown through corroboration by the police. *See Varner*, 261 Fed. App'x at 516 (denying defendant's motion to suppress evidence from a search warrant, even though the issuing magistrate was not provided with any indication of the informant's reliability or what, if any, relationship the officer had with the informant, because "unlike the officer in Wilhelm, [the detective] corroborated portions of the informant's testimony by actually visiting the site"). *See also United States v. Jordan*, 999 F.2d 11, 14 (1st Cir. 1993)

---

[8] Even if an informant was "anonymous," meaning the police did not know who they were, "[t]he law is clear that anonymous tips may establish probable cause when they are corroborated by independent police investigation." *Chin v. Wilhelm*, No. CCB-02-1551, 2006 WL 827343, at *5 (D. Md. Mar. 24, 2006) (citing *Gates,* 462 U.S. at 238; *United States v. McCraw,* 920 F.2d 224, 227–28 (4th Cir.1990)).

(reliability of hearsay statements of a confidential informant "may be corroborated by various means, including direct surveillance or circumstantial evidence").

Here, the confidential informants were entirely corroborated, establishing their reliability. Davis asserts that the Court should disregard that Davis was an associate of Raynor because it came from a confidential source, yet that information is confirmed through the call detail records showing numerous contacts between Davis and Raynor the night Raynor was killed. Also, Davis asserts that the Court should disregard that information from the confidential sources that Davis lived close to where Raynor was killed and that he had resided at 16243 Spruce Street, yet that is confirmed by credit reporting services, license plate reader hits that Davis' car was parked in front of the residence in July 2018, and his probation officer's file indicating that Davis was living at the residence with his sister. Finally, Davis says that the Court should disregard that Davis owned the red Honda Accord that the confidential source said he owned, but the Affidavit shows it was registered to registered to Davis' mother, license plate reader data showed that Honda Accord was parked in front of 1623 Spruce Street as recent as July 2018 (two months before the murdered), and police records showed that Davis was stopped in that vehicle as recent as August 2018 (a month before the murder). With this corroboration, there is no question about the reliability of the confidential sources. *See DeQuasie*, 373 F.3d at 518–19; *See United States v. Miller,* 925 F.2d 695, 699–700 (4th Cir. 1991) (holding informant's tip corroborated, in part, because the officer "knew that [the defendant] had been involved in illegal narcotics in the past" based on his prior arrest of defendant for cocaine possession approximately one year earlier).

In addition, while Davis also criticizes the affiant's statement that the confidential sources were concerned citizens who were providing information as a part of their civic duty, this is a fact that the Court can credit when determining reliability. This is not a case like *Wilhelm* were

16

the officer said the applicant was reliable and projected a truthful demeanor to increase reliability when there was affirmative information that the officer had never met the informant or even knew their name.  When the investigators have a basis for judging the credibility of the informant, unlike the officer in *Wilhelm*, then statements that may go to the informant credibility are not "puffing" but instead reflect the officer's evaluation of the encounter with the informant.  *See Perez*, 393 F.3d at 462 (explaining that the officer's "puffing" in *Wilhelm* regarding the reliability of the anonymous caller provided an additional reason to question that officer's reliance on the warrant that was not present where the affiant had an articulable basis for judging the informant's credibility—namely, meeting face-to-face). In this case, the affiant was providing the informants' possible motives for providing information, which is common in affidavits.  This type of information was important because "when examining informant evidence used to support a claim of probable cause for a warrant…the skepticism and careful scrutiny usually found in cases involving informants, sometimes anonymous, from the criminal milieu, is appropriately relaxed if the informant is an…ordinary citizen witness." *United States v. Doyle*, 650 F.3d 460, 472–73 (4th Cir. 2011).

In *United States v. Custis*, 150 F. App'x 265, 269 (4th Cir. 2005), the Fourth Circuit reversed the District Court's finding of a lack of probable cause, and held "without hesitation that the Supporting Affidavit contained sufficient indicia of the CI's reliability." There, the confidential informant was not anonymous – he was known to the officer and had given information that led to arrests in the past.  Further, the officer was able to corroborate a "substantial amount" of the information supplied by the informant.  Here, the informants were not anonymous, were ordinary citizens providing information about Davis, and every piece of information was corroborated.  The Court should find their information reliable.

Davis is grasping at straws when he argues that even if everything in the Affidavit is accepted it lacked probable cause because it does not suggest that Davis had a reason to carjack Raynor. That is not the standard the Affidavit needed to meet. "[P]robable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity. Innocent behavior frequently will provide the basis for a showing of probable cause; to require otherwise would be to *sub silentio* impose a drastically more rigorous definition of probable cause than the security of our citizens demands." *Lalor*, 996 F.2d at 1581 (citing *Gates*, 462 U.S. at 238) (internal alterations omitted). As explained above, the Affidavit established that Raynor and Davis exchanged text messages up until the time when Raynor's vehicle entered Curtis Bay, where Davis had been living. The vehicle then leaves and comes back right before Raynor is murdered, and a witness saw the car and heard the gunshots about a mile from where Davis had been living. Raynor's vehicle is then found a day later adjacent to the place where Davis had been living. The Affidavit established probable cause that Davis' cellphone records would provide evidence that Davis was the one who carjacked and murdered the victim because he was with the victim in the hours leading up to and at the time the victim was murdered on September 25, 2018. The Court should deny Davis' motion.

### 3.    The Agents Could Rely on Good Faith as Leon Applies

If it wanted, the Court would not need to even decide whether the warrant was supported by probable cause because the officers acted in good faith reliance on the issuance of the warrant. *See United States v. Leon*, 468 U.S. 897, 922-23 (1984); *United States v. Legg,* 18 F.3d 240, 243 (4th Cir. 1994) (recognizing "that a reviewing court may proceed to the good faith exception without first deciding whether the warrant was supported by probable cause" (citing *Leon,* 468 U.S. at 925)). The Supreme Court has recognized that "suppression of evidence obtained

pursuant to a warrant should be ordered . . . only in those unusual cases in which exclusion will further the purposes of the exclusionary rule." *Leon*, 468 U.S. at 918.

Typically, when a warrant is authorized by a magistrate judge, law enforcement officers are presumed to have acted in good faith. *Doyle*, 650 F.3d at 467; *see also United States v. Williams*, 548 F.3d 311, 317 (4th Cir. 2008). "[A] court should not suppress the fruits of a search conducted under the authority of a warrant, even a 'subsequently invalidated' warrant, unless 'a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization.'" *Bynum*, 293 F.3d at 195 (quoting *Leon*, 468 U.S. at 922 n. 23).

The Fourth Circuit has identified the four situations when an officer's unreasonable reliance on a warrant would preclude application of the good faith exception:

(1)  the magistrate was misled by information in an affidavit that the officer knew was false or would have known was false except for the officer's reckless disregard of the truth;

(2)  the magistrate wholly abandoned his detached and neutral judicial role;\

(3)  the warrant was based on an affidavit that was so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and

(4)  the warrant was so facially deficient, by failing to particularize the place to be searched or the things to be seized, that the executing officers cannot reasonably presume it to be valid.

*Williams*, 548 F.3d at 317–18.

In this case, there is no evidence that the Affidavit contained misleading information, that Judge Coulson abandoned his judicial role, that probable cause is so lacking that it was unreasonable for the investigators to rely on the issuing of the warrant, or that it did not particularize what was to be searched and seized. The Fourth Circuit has applied the good faith exception where, as in the instant case, investigators corroborated information obtained from confidential sources. *United States v. Rodriguez*, 827 F. App'x 293, 295–96 (4th Cir. 2020)

("The affidavit…not[es] the receipt of a tip from a reliable and credible confidential informant and detail[s] the steps taken to corroborate that tip, including surveillance, a records inquiry, and a canine-assisted search for contraband. Considering the totality of this information before the issuing judge, the affidavit was not so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable."). The investigators in this case corroborated information from confidential sources and identified additional evidence to support probable cause. If the search warrant is found to be lacking in probable cause the *Leon* good-faith exception is applicable.

### B. Davis's Statement Was Made After a Legal Arrest and a Voluntary and Knowing Wavier of His Rights Pursuant to Miranda

Davis moves to suppress his statement made to law enforcement after his arrest on a parole retake warrant issued by the State of New York. ECF No. 33. Davis claims law enforcement lacked probable cause to arrest him on November 19, 2018, and the subsequent interrogation was a result of an illegal detention. However, law enforcement knew Davis had an outstanding parole retake warrant and arrested him accordingly. Agents properly advised Davis of his rights pursuant to *Miranda*. Davis acknowledged his rights, voluntarily and knowingly waived those rights, and made a statement. The statements made to law enforcement were not coerced, involuntary, or otherwise inadmissible. For the reasons stated below, the Court should deny the motion.

#### 1. Legal Standard for Probable Cause to Arrest

The Fourth Amendment's prohibition against "unreasonable searches and seizures" also applies to the seizure of one's person. U.S. Const. amend. IV. This requires the police to have probable cause *or* a warrant before making an arrest. Probable cause exists if "at that moment the facts and circumstances within [the officers'] knowledge and of which they had reasonably

trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91 (1964). "An arrest warrant is issued by a magistrate upon a showing that probable cause exists to believe that the subject of the warrant has committed an offense[.]" *Steagald v. United States*, 451 U.S. 204, 213 (1981). "[A] magistrate judge's probable cause determination when issuing an arrest warrant is entitled to great deference." *Quarles v. Weeks*, 815 F. App'x 735, 738 (4th Cir. 2020). Recently, another judge in this Court found that the defendant was unable to show a lack of probable cause where the officers arrested defendants after the officers identified that the defendant had an open warrant from Baltimore City. *See Best v. Baltimore Cty.*, No. ELH-18-3225, 2021 WL 129963, at *11 (D. Md. Jan. 14, 2021).

Courts may reject a suppression request even if the evidence was seized pursuant to an arrest on an invalid warrant. A voluntary statement may be used at trial even if the arresting officer reasonably but wrongly believed there was an outstanding warrant. *See Herring v. United States*, 555 U.S. 135 (2009) (applying the 'good faith exception' in denying a motion to suppress evidence based on an arrest for an outstanding warrant had, in fact, been "recalled" months earlier); *Arizona v. Evans*, 514 U.S. 1 (1995) (no suppression required when judicial employee told officer, erroneously, that there was outstanding warrant).

In *Herring*, the Supreme Court emphasized the need to balance a Fourth Amendment violation with the effect suppression will have on future deterrence of unconstitutional police action. 555 U.S. at 142. The Court held that the exclusionary rule should not apply if officers had a good-faith basis to believe the warrant was valid, and mistakes were negligent rather "than a systemic error or reckless disregard of constitutional requirements". *Id.* at 147-48.

## 2.  Legal Standard for Admissibility of a Statement

The Fifth Amendment prohibits compelled self-incrimination. U.S. Const. amend. V. Members of law enforcement must inform individuals who are in custody of their Fifth Amendment rights prior to interrogation. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). Any individual in police custody and subject to custodial interrogation "must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Berkemer v. McCarty*, 468 U.S. 420, 429 (1984) (quoting *Miranda*, 384 U.S. at 444). Officers may issue *Miranda* warnings orally or in writing. *See, e.g.*, *United States v. Abdi Wali Dire*, 680 F.3d 446, 474 (4th Cir. 2012) (upholding oral warnings).  An individual is "in custody" for *Miranda* purposes when, under the totality of the circumstances, "a suspect's freedom of action is curtailed to a degree associated with formal arrest." *Berkemer*, 468 U.S. at 440. "Interrogation" for *Miranda* purposes means "words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).

In addition to complying with *Miranda*, an individual's statements also must be provided voluntarily. The applicable test for evaluating the voluntariness of a statement or confession is whether, given the totality of the circumstances, the will of the speaker was "overborne and his capacity for self-determination critically impaired." *United States v. Gray*, 137 F.3d 765, 771 (4th Cir. 1998) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 225–26 (1973)); *see also Mincey v. Arizona*, 437 U.S. 385, 399 (1978); *Haynes v. Washington*, 373 U.S. 503, 513 (1963).  In making this determination, "coercive police activity is a necessary predicate" to any finding that a

confession was not "voluntary" within the meaning of the Due Process Clause of the Constitution. *Colorado v. Connelly*, 479 U.S. 157, 167 (1986).

In applying these general principles to various factual scenarios, the Fourth Circuit has considered, among other things, factors such as: (1) whether law enforcement officers properly advised the suspect of his right not to make any statements and of his right to have an attorney present; (2) whether the officers inappropriately told the suspect that he was legally obligated to speak with them; (3) whether the officers physically or verbally threatened the suspect; (4) whether the suspect appeared to be cooperative; (5) whether the suspect was misled by the officers into believing that his statements could not be used against him; and (6) whether the officers engaged in any violent behavior during their questioning. *See United States v. Braxton*, 112 F.3d 777, 781–85 (4th Cir. 1997); *Gray*, 137 F.3d at 771. Courts are more likely to find a statement was not voluntary if it follows an unlawful arrest. *Won Sun v. United States*, 371 U.S. 471, 484-86 (1963).

Accordingly, "[a]ny statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence.... Volunteered statements of any kind are not barred by the Fifth Amendment." *Innis*, 446 U.S. at 299-300; *see also Michigan v. Harvey*, 494 U.S. 344, 353 (1990) ("Although a defendant may sometimes later regret his decision to speak with police, the Sixth Amendment does not disable a criminal defendant from exercising his free will."). Thus, unprompted, spontaneous, and otherwise voluntary statements are not prohibited by *Miranda* and are thus admissible. *United States v. Rhodes*, 779 F.2d 1019, 1032 (4th Cir. 1985) ("*Miranda* does not protect an accused from a spontaneous admission made under circumstances not induced by the investigating officers or during a conversation not initiated by the officers."); *United States v. Wright*, 991 F.2d 1182, 1186 (4th Cir. 1993) ("[S]pontaneous statements [that are] not the product of interrogation [are] not barred by the Fifth Amendment."); *United States v.*

*Jackson*, 863 F.2d 1168, 1172 (4th Cir. 1989) (holding that officer's statement in response to conversation initiated by the defendant should not be construed as attempt to solicit information). The government bears the burden of proving voluntariness or spontaneity by a preponderance of the evidence. *See, e.g.*, *Braxton*, 112 F.3d at 781.

### 3.  Analysis

#### a.  Law Enforcement had Probable Cause to Arrest Davis

Davis contends that his recorded oral statement was obtained improperly because he was arrested without probable cause or reasonable suspicion on November 19, 2018. ECF No. 33. Davis's motion should be denied because Davis had an outstanding warrant for his arrest in New York State. *See* Gov't Exh. B.  Agent Cheplak knew Davis had an outstanding warrant and contacted the New Haven Police Department (NHPD) to arrange the arrest of Davis. A TFO with NHPD confirmed a warrant out of New York with full extradition for a Violation of Parole. Parole Officer Healy sent NHPD confirmation of the parole warrant, a New York State Department of Corrections photo of Davis, and a copy of Davis's fingerprints. Officers located Davis at a laundromat in New Haven and took Davis into custody. TFO Diaz compared the photo of Davis supplied by the parole officer and confirmed the match to Davis.

#### b.  Davis's Statement was Made Knowingly and Voluntarily

Davis made recorded post-*Miranda* statements to law enforcement after his arrest in this case.  *See* Gov't Exh. C. Following his lawful arrest, Davis was transported to NHPD where TFO Kershaw advised Davis of his *Miranda* rights. TFO Kershaw used a written *Miranda* form in doing so, and Davis orally agreed that he understood each right. *See Dickerson v. United States*, 530 U.S. 428, 444 (2000) (a statement following a *Miranda* advisement will "rare[ly] be deemed involuntary"). At no time before questioning did Davis request counsel or invoke his right to

silence or his right to have counsel. At no time before questioning did Davis express or exhibit behavior consistent with being unable to understand TFO Keshaw, or SA Cheplak who joined in on the questioning after the *Miranda* rights were administered. Similarly, at no time did Davis express or imply that he did not understand TFO Kershaw's vocabulary or meaning when the TFO Kershaw read Davis his *Miranda* rights. On the contrary, Davis's clear acknowledgement of understanding each right as captured on video reflect his voluntary decision to waive his rights and talk to investigators. He did not ask any questions or voice any concerns about his ability to understand his rights.

Davis was cooperative and voluntarily responded to questions from the agents throughout the interview. The agents neither physically nor verbally threatened Davis, and they did not engage in any violent, aggressive, or intimating behavior during questioning. *Cf. Braxton*, 112 F.3d at 781–85. The interview stopped promptly when Davis ceased providing further information. Prior to this cessation, Davis made no "unambiguous[] and unequivocal[]" request for assistance of counsel. *United States v. Pettiford*, 295 F. Supp. 2d 552, 562–63 (D. Md. 2003). Moreover, neither TFO Kershaw nor SA Cheplack intimidated Davis into making a statement. They do not engage in acts rendering Davis's will overborn or render his "capacity for self-determination critically impaired." *United States v. Pelton,* 835 F.2d 1067, 1071–72 (4th Cir. 1987). Because Davis's arrest was lawful and his statements were made post-*Miranda*, the statements were voluntary and should not be suppressed.

### C. The Firearms Are Intrinsic to the Case at Hand and Relate to Credibility.

#### 1. Legal Standard

"[E]vidence of uncharged conduct is not considered 'other crimes' evidence if it arose out of the same series of transactions as the charged offense or if it is necessary to complete the story of the crime on trial." *United States v. Kennedy*, 32 F.3d 876, 885 (4th Cir. 1994); *United States v.*

*Siegel*, 536 F.3d 306, 316 (4th Cir. 2008); *United States v. Basham*, 561 F.3d 302, 326 (4th Cir. 2009). Additionally, "acts are intrinsic when they are inextricably intertwined" with the charged conduct. *United States v. Lighty*, 616 F.3d 321, 352 (4th Cir. 2010) (internal quotation marks omitted).

Fed. R. Evid. 404(b) permits evidence of a defendant's prior crimes, wrongs, or other "bad acts" to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident," but only if (1) relevant to an issue other than character; (2) necessary; and (3) reliable. *See generally United States v. Penniegraft,* 641 F.3d 566, 574 (4th Cir. 2011); *Basham,* 561 F.3d at 325-30; and *United States v. Uzenski,* 434 F.3d 690, 710-11 (4th Cir. 1993). Rule 404(b) is an inclusive rule," *United States v. Wilson*, 624 F.3d 640, 651 (4th Cir. 2010) (internal quotation marks omitted), and "allows admission of evidence of the defendant's past wrongs or acts, as long as the evidence is not offered to prove the defendant's predisposition toward criminal behavior," *United States v. Sterling*, 860 F.3d 233, 246 (4th Cir. 2017). The evidence also must be admissible under Fed. R. Evid. 403, in that the evidence's prejudicial effect does not substantially outweigh its probative value. *Id*. at 247.

### 2.   The Firearms are Inextricably Intertwined with the Offenses Charged

Here, the firearms discovered during the search of the apartment where Davis stayed in Connecticut are inextricably intertwined with the offenses charged and are necessary to complete the story of the crime. Witnesses will testify that Raynor owned two firearms, a shotgun and a small gun or revolver; the revolver recovered at A.R.'s apartment is a small. The Government will present evidence to show that Raynor picked up Davis in Curtis Bay around 8:50 p.m. on the day he was murdered, and they drove to Raynor's residence in Severn. At some point during that drive, Raynor sent a strange message to his brother asking him to open the basement door to their

residence.[9] After going to Raynor's residence, Davis and Raynor travelled back to Curtis Bay where Davis murdered Raynor.

It was later discovered that Raynor's shotgun, small handgun, and marijuana were missing from the basement of his residence. No one knew the serial numbers of this shotgun and revolver, but Davis was found in possession of a revolver and a shotgun, in an apartment where Davis stayed, less than two months after Raynor was murdered. Davis' phone revealed that he was attempting to sell the revolver after Raynor's death. And, most tellingly, Davis tried to swallow the key to the safe where the revolver was found so the investigators could not find that firearm.

These facts suggest that those firearms are the ones that belongs to Raynor. This is no different if Davis had been in possession of jewelry or clothing that witnesses knew Raynor to wear; possession of items of the victim after he is murdered can be evidence of guilt depending on the circumstances. The Government intends to introduce evidence that Davis possessed the two firearms, not to show that he had a propensity to possess or sell firearms, but to show that Davis was in possession of Raynor's firearms because he carjacked him, stole his firearms and marijuana, and killed him.

Evidence of this kind is admissible. In *Samples v. Ballard*, No. 2:14-CV-15413, 2016 WL 1271508, at *14 (S.D.W. Va. Mar. 31, 2016), *aff'd*, 860 F.3d 266 (4th Cir. 2017), the court held that ample evidence suggested that the petitioner was in possession of the murder victim's stun gun and jewelry because (1) a witness testified that the victim received a stun gun the day before she was murdered and the petitioner's girlfriend testified that the petitioner traded a stun gun for

---

[9] The message was strange because it addressed Raynor's brother as "brother," which Raynor never did, and it asked the brother to open the basement door, which was never used and was barricaded with items. The message was likely strange because Raynor did not send it, Davis or an accomplice did.

drugs, and (2) petitioner pawned jewelry the day after the victim's death and the victim's friend testified that the jewelry looked similar to the victim's. *See also United States v. Smith*, 703 F. App'x 174, 176 (4th Cir. 2017) ("we find the district court did not abuse its discretion in admitting the evidence that Smith possessed a firearm matching the description of one of the firearms found in his house."); *United States v. Reed*, 780 F.3d 260, 270 (4th Cir. 2015) (finding strong evidence of bank robbery including, among other things, that investigators found in home of a defendant three firearms that matched witnesses descriptions of the firearms used at the robbery).

### 3. Possession of the Firearms Goes to Credibility, A Permissible 404(b) Purpose

Although impeachment of witness is not among "other purposes" explicitly listed under Fed. R. 404(b), governing admissibility of evidence of other crimes, wrongs, or acts by way of example, that list is not exhaustive, and impeachment qualifies as permissible purposes for introduction of such evidence. *See United States v. Stockton,* 788 F.2d 210, 219 n. 15 (4th Cir. 1986). In this case, Davis told TFO Kershaw and Agent Cheplak that he did not know about, nor possessed, the revolver and firearm found in A.R.'s apartment. However, Davis swallows a key that opens the safe where the revolver was recovered, and Davis's DNA is found on both weapons. Davis's credibility is at issue and the firearms directly challenge that.

### 4. Evidence of the Firearms is Not Unfairly Prejudicial

As to Davis' unfair prejudice argument, the admission of evidence does not result in unfair prejudice under Fed. R. Evid. 403 where it does not involve conduct any more sensational or disturbing than the crimes with which the defendant was charged. *United States v. Boyd*, 53 F.3d 631, 637 (4th Cir. 1995). *See also United State v. Pitre*, 960 F.2d 1112, 1120 (2d Cir. 1992); *United States v. Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990). Evidence found to be relevant and probative as intrinsic should be excluded under Fed. R. Evid. 403 only in those instances where

the trial judge believes there is a genuine risk that the emotions of the jury will be excited to irrational behavior, and that this risk is disproportionate to the probative value of the proffered evidence. *Morgan v. Foretich*, 846 F.2d 941, 945 (4th Cir. 1988). Here, the possession of the firearms is relevant for the reasons explained above. That possession is not more sensational or disturbing than the allegations contained in the Indictment, that Davis carjacked and murdered Raynor. The evidence is intrinsic and should be admitted.

**<u>CONCLUSION</u>**

For the reasons explained above, the Court should deny the Defendant's motions.