IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND
NORTHERN DIVISION

| UNITED STATES | : | |
| --- | --- | --- |
| | : | |
| v. | : | Case No.  RDB-19-0398 |
| | : | |
| COLLIN DAVIS, | : | |
| | : | |
| Defendant. | : | |

**DEFENSE SENTENCING MEMORANDUM**

The defendant, Collin Davis, by and through undersigned counsel, asks the Court to impose the 25-year sentence agreed to by the parties pursuant to Rule 11(c)(1)(C) for the events that occurred on September 25, 2018, resulting in the death of Anthony Raynor.  Mr. Davis considered Mr. Raynor to be a friend.  They grew up together and played basketball together.  In fact, Mr. Raynor's step-father was their basketball coach.  Mr. Davis is very sorry for what transpired the evening of September 25, 2018.  Things got out of hand and did not go the way they were supposed to with tragic results.  Mr. Davis has seen Mr. Raynor's family members in court and anticipates that they will be present at the sentencing hearing.  He wants to express his heart-felt apology to Mr. Raynor's family for what happened.

The 25-year sentence agreed to by the parties on Count 1—carjacking resulting in death—is appropriate given Mr. Davis' tragic personal history and circumstances, including a traumatic childhood and the fact that he contracted COVID-19 twice while detained at the Chesapeake Detention Facility awaiting the resolution of this case; his willingness to plead guilty and demonstration of remorse; and sentences received in similar cases in this District over the past several years.  Accordingly, we ask the Court to

1

impose a 25-year (or 300-month) sentence followed by a 3-year period of supervised release.

### I. Mr. Davis Grew Up Without His Parents, Enduring Abuse that Caused Him To Seek Independence Far Too Early.

As part of plea negotiations in this case, the Defense provided the prosecuting attorneys with a social history report prepared by Social Worker Gail Reid. The report, which is attached as Exhibit A, documents the "significant complex trauma" that Mr. Davis experienced throughout his childhood, "contribut[ing] to a very early drive to be self-sufficient by pursuing success through the avenues that were open to him at the time." Exhibit A at 5. With little education and few role models, Mr. Davis began getting into trouble at a young age and was treated by the criminal justice system as an adult even while still a minor. Mr. Davis has spent almost his entire adult life incarcerated, and yet he has managed to maintain a strong bond with his sister, whom he has always protected; her children; his daughter and son; and his mother. "He has overcome significant obstacles in his life and has an insight and perspective that will be to his advantage in the years ahead." *Id.*

Mr. Davis, now 35 years old, lived with his mother (Shar-ron Davis), father (Carol Spence) and siblings in Brooklyn, New York, until his mother learned that his father was having a baby with another woman. *Id.* at 1. Ms. Davis grew up in Brooklyn and enlisted in the military with Eric Cade. During a routine medical evaluation, she learned that she was pregnant with Eric's child. Ms. Davis left the military and went home to Brooklyn to give birth to her oldest child, Eric Davis, in 1984. Ms. Davis met Mr. Spence at a nightclub he owned. He was 17 years older, but romanced her and provided what she needed for Eric. Soon, Ms. Davis became pregnant with Mr. Davis, and gave birth in September

1986.  Eleven months later, she gave birth to Colleen.  While pregnant with Colleen, Ms. Davis learned that Mr. Spence was expecting a baby with another woman.  She decided to leave Mr. Spence and moved with her children to Maryland, where her mother resided.

Ms. Davis soon moved in with her boyfriend, Michael Anthony Noble.  Mr. Davis and his siblings shuttled between their mother and grandmother in Maryland and their extended family in New York.  *Id.* at 1.  Before his fourth birthday, Mr. Davis's mother was arrested and charged in a federal drug conspiracy with Mr. Noble and many others. *United States v. Noble et al.*, No. R-90-099 (D. Md.).  Mr. Noble was the lead defendant. According to the docket sheet we obtained from the Court's archives, attached as Exhibit B, the Court detained Ms. Davis on May 1, 1990.  On October 15, 1990, Ms. Davis pled guilty to the second superseding indictment, and on November 27, she was transferred to VOA.  *Id.*  Several of her co-defendants went to trial and were found guilty.  On April 25, 1991, the Court sentenced Ms. Davis to 78-months imprisonment followed by 4 years of supervised release; Mr. Noble received a 405-month sentence.   *Id.*   According to the Bureau of Prisons website, Ms. Davis was released from custody on December 22, 1995.

Ms. Davis told a mitigation specialist hired by the Defense that Mr. Spence had wanted the children, and she would have preferred for him to take the children.  However, her mother refused to allow Mr. Spence to take the children and took custody of them. "Collin recalls being able to visit [Ms. Davis] only two or three times a year." Exhibit A at 1.  Ms. Davis recalls that family visiting days in the Bureau of Prison were the best and worst days: the best because she loved being able to see her children; the worst because it was incredibly painful when they left.  She recalls Mr. Davis had the hardest time of her children leaving the visits.  He would cling to her when it was time to leave the facility. *Id.*

Mr. Davis' time residing with his grandmother was quite difficult. His grandmother was "physically and emotionally abusive toward Collin. He was singled out for this abuse, as described by his sister." *Id.* Colleen, who is only 11-months younger than Mr. Davis, reports that he was her "protector." *Id.*

> The physical abuse by his grandmother was frequent and severe. She is described as having beaten Collin daily, using both her hands and whatever instruments were available, such as extension cords. At times, he would be made to stand for extended periods of time with his arms out. The abuse was unpredictable and not necessarily in response to any behavior by Collin but seemed to be more related to her rage. His sister reports that he often protected her, taking the blame and subsequent punishment. He is described as the "scapegoat" of the family and the outlet for his grandmother's rage. Collin would often cry following the beatings and his sister would sneak into his room to comfort him. Collin rarely expressed other emotion at home and would exhibit dissociative symptoms during the beatings. This is described as a "blank stare" during the beatings, at which times he appeared to emotionally shut down and "disappear into himself."

*Id.* at 2.

Mr. Davis' siblings had some respite from the situation, but he did not. "Collin's siblings received some care and attention from their godparents and extended family but Collin felt no such adult presence in his early life." *Id.* Whereas, "[h]is siblings received clothing, shoes, candy, and other gifts, and spent time away from their grandmother's home with relatives," Mr. Davis, in contrast, "felt as though he had nothing and no one, from an early age." *Id.* at 1-2. He "did not understand why his father did not come to take care of him." *Id.* at 1. Early on after Ms. Davis' arrest, Mr. Spence sent money to her mother for care of the children. However, this stopped when Mr. Davis was around 7 years old. *Id.* It was only as an adult that Mr. Davis reestablished communication with his father and learned that his father had lost his business and experienced a period of homelessness. *Id.*

4

Just as Mr. Davis' family failed to provide him with needed support, school failed as well. "He was often teased by the other children at school and began getting into fights with the children who made fun of his mother being incarcerated." *Id.* at 2. Educational records received from the Anne Arundel County Public Schools "indicate that he had difficulty learning from the outset. By the third grade, his achievement was below grade level and there was a recommendation for special education for the fourth and fifth grades, though there is no record of services being provided." *Id.*

A 2020 evaluation of Mr. Davis' intellectual functioning conducted by Neuropsychologist Joette James revealed that "Mr. Davis demonstrates a clear pattern of weaknesses in language-based and verbal reasoning skills (including verbal memory and language-based academics such as reading and spelling)." Exhibit C at 2 (Letter of Joette James). His verbal comprehension index of 76 places him in the Borderline range and in the 5th percentile, meaning 95 percent of adults perform higher on the index. *Id.* His word reading falls at the 6th grade level; his spelling at the 5th grade level. *Id.*

Dr. James found that Mr. Davis has "relative strengths in visual-spatial, nonverbal abilities and mathematics." *Id.* His math computation tested at the 10th grade level; his perceptual reasoning index was 102, placing him in the average range of intelligence. *Id.* Dr. James explains that "[h]is pattern of difference" between his verbal and non-verbal skills "is statistically significant and clinically meaningful in that there is a 26-point difference." *Id.*

Dr. James explains that despite these visual-spatial strengths, Mr. Davis' significant language-based deficits would have made school—and life—a struggle.

> A poor ability to understand and express oneself verbally makes it extremely challenging to manage the pace and content of the typical classroom. While such individuals may acquire early, rote academic skills easily (e.g., simple

5

> arithmetic), they are quickly outmatched by a curriculum which increasingly focuses on one's ability to use language to reason, infer, make decisions, and learn effectively (i.e. one learns to read, then, in later grades, reads to learn).
>
> Good language skills are also critical for engaging in play with others at a young age and integrating with others socially. We live in a language-driven society, and the demands on communication skills increase with age. Without them, it is very difficult to "keep up" with one's peers. Individuals with this profile, like Mr. Davis, who see themselves as "different" from an early age often become increasingly discouraged, self-deprecating, depressed, withdrawn, and disengaged from others, particularly as they continue to struggle while they see their peers go on to succeed in life in important areas such as career, relationships, etc. They may want to have meaningful social connections with others, but over time, they are increasingly less able to function effectively in the social world without support.

*Id.* at 3. Having reviewed Mr. Davis' school records from Meade Middle School, Ms. Reid notes that, "[r]ather predictably, his school performance deteriorated during his middle school years." Exhibit A at 2.

Compounding the abandonment by his parents, the emotional and physical abuse by his grandmother, and the neurodevelopmental impairments that made school an extreme challenge, Mr. Davis had to navigate "significant violence in the community" where his grandmother resided: Pioneer City. *Id.* at 2.

> Pioneer City is a small community within Severn, Maryland originally built in 1970 to accommodate off-base housing for Ft. Meade soldiers and their families. It has the second-lowest median income in [Anne Arundel] County. Ft. Meade no longer permits soldiers to live in this community, due to the high rate of violence and drug trafficking, including an open-air crack cocaine market. This community includes what was known 20 years ago statistically as "the most dangerous street in the county." In 2000, about one in five shootings and homicides in the county occurred on that one street of Pioneer City, which includes the court adjacent to Collin's grandmother's home. In the community, a person was twice as likely to be a victim of crime as in any other part of the county. In 1997, when Collin was age 11, there were nearly 700 incidents of major crime, including assaults, weapons offense, and thefts in this community of 1500. Most of the violence at that time was confined to the community, related to the dynamics of the open drug market. This community provides a significant backdrop of Collin's childhood and youth. He recalls first seeing a dead

6

>body at age 7 and witnessed a shooting at age 8.  These experiences were repeated "hundreds" of times in his childhood and youth.

*Id.* at 2-3.  All of these familial, educational and community factors "contributes to a picture of complex trauma experienced by Collin during his childhood."  *Id.* at 2.  Desperate to find independence so he could escape his situation—at 7 years old—"he decided that he would become a drug dealer in order to be able to take care of himself, since he felt that he had no one to do that for him."  *Id.* at 2.

Mr. Davis' mother moved to Pioneer City once released from the Bureau of Prisons.  At 9 or 10 years old, Mr. Davis and his siblings went to live with her.  In addition to reuniting with his mother, he also had basketball.  He played basketball throughout his youth and made the Pioneer City All Stars, an AAU team, coached by Anthony Raynor's step-father.  "Collin had a very positive relationship with the coach and spent time at the coach's home.  Collin reports that this was the only family he knew that had both a mother and father living there, and he felt like 'part of the family.'"  *Id.* at 3.  Mr. Davis and Mr. Raynor played basketball together and were friends, making the turn of events on September 25, 2018, all the more tragic.

But neither Mr. Davis' mother's return from prison nor the basketball team provided the support Mr. Davis needed to recover from years of trauma.  It was too little, too late to change his trajectory.  "By age 11, Collin was spending a lot of time with males in the neighborhood ranging in age from 17-19.  Within six months he went from selling weed to crack.  He often went back and forth to New York, where his cousins and half-brothers would provide him with drugs to take back to Maryland.  At age 13, Collin would exchange drugs for use of a car and drive to Baltimore to sell drugs on the street with his cousins in west Baltimore."  *Id.* at 3.  For a time, Collin "was adept at staying out of trouble

and violence." *Id.*  He wanted only to make money, and would spend his earnings on gifts for his siblings and mother.  *Id.*

When Mr. Davis was 13 years old, his mother, who found work at an assisted living community, moved the family to The Provinces, a safer community.  *Id.*  "Collin, however, often gravitated to his old neighborhood, staying with friends."  *Id.*  He was engaged in relationships with older women, enabling him to increasingly live away from home.  *Id.*

Mr. Davis continued to go to school, but in seventh grade he "failed fundamental reading and math.  Although special education services were recommended, he did not receive these."  *Id.*  Mr. Davis struggled with learning and disciplinary issues in middle school, but he completed the eighth grade.  *Id.*  As Dr. James described is all-too common for individuals with Collin's language-based deficits, school became too much of a struggle.  Exhibit C at 3.  He never attended high school.  Exhibit A at 4.

When Mr. Davis was 14 years old, he and his older brother got into a fight.  *Id.* at 4.  "His mother beat him and although he did not fight back or defend himself, he made the conscious decision that it was 'time for me to be a man' and that 'no one is ever going to beat me again.'"  *Id.*  Mr. Davis moved out of his mother's house and back to Pioneer City, where he supported himself selling drugs.  *Id.*  At age 14, he was on his own.  By 16, he fathered his daughter, Kaliyah.  *Id.*

A month after his 17th birthday, he was arrested in a house on Pioneer Drive and charged as an adult with possession with intent to distribute a controlled substance and detained.  PSR ¶ 29.  While detained on that charge, he was charged as an adult with an armed robbery that had occurred on July 13, 2003.  PSR ¶ 30.  For the drug case, Mr. Davis received 12 years all but 5 years suspended.  PSR ¶ 29.  For the armed robbery, he received 12 years suspend all but 6 years and 6 months.  PSR ¶ 30.  "He was placed in an

8

adult population and reports at the time he was small stature, weighing about 120 lbs. He had to learn to defend himself, saying that 'if you let them take it, they will come every time." Exhibit A at 4. Mr. Davis literally entered adulthood in the Maryland Department of Corrections ("DOC").

Upon his release from custody on September 8, 2008, s*ee* PSR ¶¶ 29-30, Mr. Davis returned to his mother's home. Kaliyah, then 5 years old, came to live with him to escape the abuse she suffered at the hands of her mother, with whom Mr. Davis did not get along. Exhibit A at 4. Mr. Davis utilized the vocational skills he had learned within the DOC to do home improvement jobs for people in the community. *Id.*

Sadly, Mr. Davis' time in the community was short lived. On January 27, 2009, Mr. Davis was in a car with two other men in Queens County, New York, when the police pulled over the driver for a traffic violation. The officer saw a firearm in a bag on the backseat of the car. PSR ¶ 31. Mr. Davis had been sitting in the front passenger seat; the bag was in the back passenger seat behind the driver and next to the third passenger. *Id.* Although one of the other men in the car pled guilty to possessing the firearm, the District Attorney's Office refused to drop the charges against Mr. Davis. He insisted on a trial. After the jury convicted him, the judge sentenced Mr. Davis to seven years of incarceration followed by 5 years of probation. *Id.*

At first, "[h]e was incarcerated at Riker's Island. ... Collin described the institution as 'very big and very dangerous.'" Exhibit A at 4. After he was sentenced, he was transferred to the New York prison system. "[H]e often had trouble because he refused to be part of any gangs, choosing to maintain his 'independence' again. He identified his strong dislike for 'a group that thinks they are in a position of power,' because 'they usually abuse that power.'" *Id.* He tried to stay productive, writing a "program for

9

underprivileged youth, called 'Hope,' that he hoped might prevent[] youth from traveling the same type of path. He wrote about the impact of the lack of 'father figures' in his community." *Id.* He also took vocational classes, earning certificates in plumbing, flooring, custodial maintenance and building maintenance. *Id.* at 5.

Once released on January 19, 2017, Mr. Davis had his supervision transferred to Maryland. Probation records reflect that Mr. Davis stayed in close contact with his Probation Officer for the first 10 months of supervision, reporting every other week and participating in substance abuse treatment and testing. At first, he resided with his wife, Lanaya Davis, whom he had married in 2015, but he then returned to his mother's house, and then to a rental in Curtis Bay. He also fathered a son, Jamir Davis, with long-time friend Jacquetta Price. PSR ¶ 61.

Mr. Davis tried to get custody of Kaliyah, who frequently ran away from her mother's house. Howard County Police Department records show that whenever Kaliyah ran away from home, her mother would call the police and blame Mr. Davis. The police would contact Mr. Davis, and he would explain his whereabouts and that he did not have his daughter. On one occasion in June 2018, Mr. Davis called the Howard County Police to assist because Kaliyah's mother, Lashannon, had hit her and taken the phone that Mr. Davis had given her so that she could stay in communication with him. Mr. Davis called the police when he was in a car with his sister outside of Lashannon's residence. The officer noted that "at no time did [Mr. Davis] attempt to go near or enter the residence." Lashannon and her family members surrounded Mr. Davis' car and were screaming at him—all while the Howard County Police Officer tried to calm them. The police noted in his report that "Davis remained with his vehicle during the entire incident as instructed

by the officer. At no point did he approach or attempt to make physical contact with Lashannon." Today, Kaliyah resides with Mr. Davis' mother.

As the Court is now aware, Mr. Davis met up with his friend Anthony Raynor the night of September 25, 2018. Plea Agreement, ECF No. 50 at 9. Together, they traveled back to the Severn-area where they had grown up. *Id.* Mr. Davis took control of Mr. Raynor's car, who he restrained in the backseat of the vehicle. *Id.* When the men were back in Curtis Bay, Mr. Raynor attempted to break free of the restraints and Mr. Davis fatally shot him. *Id.* As expressed at the very beginning of this memorandum, Mr. Davis considered Mr. Raynor to be a friend and has deep remorse for what he did.

## II.     Mr. Davis' Conditions of Confinement and Hopes for the Future.

Mr. Davis has been in continuous custody since November 19, 2018, since his arrest by the ATF in New Haven that day. The ATF first transported him to New York, where he faced a violation of probation warrant. Mr. Davis remained in the New York prison system for almost a year. The day after his arrest, he was charged in the District Court of Maryland with Mr. Raynor's murder. On August 7, 2019, he was transferred to Maryland state custody from New York and held without bond. The state charges were dismissed on September 5, 2019, by which time he had been indicted federally. He made his initial appearance in the U.S. District Court for the District of Maryland on September 6, 2019. PSR ¶ 47. Because Mr. Davis' first 10 months in custody were allocated toward his violation of probation in New York, he will only receive credit toward his federal sentence for his time in custody beginning August 7, 2019.

Mr. Davis' nearly two years in federal custody has been harrowing. Mr. Davis contracted COVID-19 ***twice*** while at the Chesapeake Detention Facility ("CDF"). Mr. Davis first tested positive for COVID in September 2020. *Catchings et al. v. Wilson et al.,*

11

No. TSE-21-cv-0428, ECF No. 1 ¶ 30 (D. Md. Feb. 20, 2021). After he tested positive in early September, he was transferred to the isolation unit at the Patuxent Institution, where he waited for days before being provided with basic necessities and the inhaler he relies on for his asthma. Mr. Davis again tested positive for COVID-19 at CDF in January 2021. *Id.* While being held in isolation in the CDF cadre, he was told to take another inmate's medications several times and was not provided with the medications that he was supposed to be taking. *Id.*

Demoralized by contracting COVID-19 a second time and the way he was treated, Mr. Davis decided to participate in the lawsuit against CDF filed by the Lawyers Committee on Civil Rights Under Law in February 2021. Both because Mr. Davis contracted COVID-19 twice at CDF and could reliably recount what was happening within the institution, the plaintiffs' attorneys decided to use Mr. Davis as a named plaintiff in the class-action lawsuit. Since February, Mr. Davis has been a consistent reporter to counsel of what staff at CDF have been doing. These reports have been an essential means by which plaintiffs' counsel have been able to monitor whether or not CDF is fulfilling the obligations it agreed to in response to the lawsuit.

Though Mr. Davis is proud that he participated in the lawsuit to improve the conditions for the men and women housed at CDF, his participation has not been without a cost. Mr. Davis has been subjected to comments and actions by staff strongly indicative of retaliation for his participation in the lawsuit and reporting of incidents to his attorneys. When he has reported these incidents to plaintiffs' counsel, more comments and disturbing behavior by the staff have followed. The circumstances have made Mr. Davis almost desperate for transfer from CDF to the Bureau of Prisons.

What has kept Mr. Davis going throughout his incarceration is the incredibly tight bonds that he has maintained with his sister, Colleen; her children; his mother; his now 18-year-old daughter, Kaliyah; and Jaquetta Price and their 3-year-old son, Jamir. Exhibit A at 5. Collin speaks with Colleen daily—often more than once a day. She is his best friend. Though Collin has spent most of his adult life in custody, Colleen reports that Collin has built a beautiful relationship with her children, ages 3, 4, 13 and 17. He talks with them regularly, and she says he is a big presence in their lives. He has a theme song he sings for each of them. Colleen gave birth to a baby girl, Zuri, on May 24, 2021. Collin hopes that he will complete his sentence in time to see Zuri graduate or, at least, get married.

Collin deeply regrets how much of his daughter Kaliyah's life he has missed. Nonetheless, they are very close and he speaks with her regularly. Collin could not be there when Kaliyah attended her senior prom and graduated from high school this year. However, he is so engrained in the life of his family that they made sure he spoke with Kaliyah as her family was getting her ready for the prom, and they provided undersigned counsel with photos (below) of Kaliyah to show Mr. Davis during a video legal visit so that



he could see his daughter's excitement. He was similarly with her in spirit when she graduated from high school and is elated that she intends to join the military with a younger cousin as soon as her cousin is old enough to do so. PSR ¶ 60. As Kaliyah navigated her senior year of high school and tried to decide what to do upon graduation,

13



Mr. Davis advocated for her to join the military so that she could see the world and get help paying for a college education.

Throughout his incarceration, Mr. Davis has also maintained regular contact with his son, Jamir, and Jamir's mother, Jacquetta. He speaks with Jaquetta almost every day to check up on Jamir, and during the pandemic, he has visited with Jamir via Skype every other week.

Mr. Davis has also found solace in speaking with his mother. Ms. Davis prays with him by the phone and helps him maintain optimism when he experiences periods of significantly depressed mood. PSR ¶ 76. Mr. Davis has not been able to see his family in person since March 2020 (other than in the courtroom for his guilty plea). They are eager to visit him within the BOP once he is transferred and social visits are restored.

### III.   The 25-Year Sentence Agreed to by the Parties Is in Keeping with Recent Sentences for Similar Conduct.

Although the Presentence Report calculates Mr. Davis' applicable guidelines range to be 360 months to life, PSR ¶ 94, the 300-month sentence agreed to by the parties pursuant to Rule 11(c)(1)(C) is appropriate given Mr. Davis' personal history and circumstances and what defendants in this District have been receiving for similar—and indeed, more premeditated—conduct. The following cases are all useful comparators that demonstrate the agreed-upon sentence adequately reflects the seriousness of the offense, provides a general deterrent, and prevents disparity for similar offenses.

- A few months ago, Judge Grimm sentenced Justin Antoine to 270-months imprisonment after he admitted to walking into a recreation center and fatally shooting a juvenile twice in the head in retaliation because he believed the victim had previously robbed him of drugs that he had been selling illegally as

part of a drug conspiracy. *See United States v. Justin Antoine*, No. PWG-19-0140, ECF No. 349 (D. Md. Dec. 3, 2020).

- In another well-publicized case, the Court sentenced the defendant, who admitted to firing multiple gunshots at individuals in a vehicle, one of which missed and tragically struck and killed a three-year-old child, to 25-years incarceration. *See United States v. Plummer*, No. GLR-17-0223, ECF No. 460.

- In 2017 through 2019, Judge Russell imposed sentences of 25 years or slightly less in *United States v. Alewine et al.*, No. GLR-16-0453, even though defendants in that case admitted to multiple shootings. Keenan Lawson, for example, was sentenced to 23 years despite admitting to killing an innocent bystander and to shooting two other individuals in attempts to murder them. *See* Plea Agreement, ECF No. 604.

- In *United States v. Kevin Alexis Hernandez-Guevara*, No. PX-17-0382, the Court sentenced the defendant, an MS-13 member who helped lure a victim to a secluded location where gang members shot, assaulted, and fatally stabbed him and, in another incident, shot and stabbed two victims, causing them to sustain serious and life-threatening permanent injuries, to 24.3 years. *See* Plea Agreement, ECF No. 192.

- In *United States v. Moreno-Martinez, et al.*, No. PX-17-0154, three MS-13 gang members pleaded guilty to a conspiracy to kidnap, but their actual conduct involved premeditated murder of a victim. The leader, Neris Moreno-Martinez, received a sentence of 30 years, and his co-conspirators, Jose Melendez-Rivera and Reynaldo Granados-Vasquez, each received sentences of 20 years.

- In *United States v. Miguel Lopez Abrego*, No. JKB-16-0259, the Court sentenced the defendant to 300 months after he admitted to his participation in a violent racketeering conspiracy, including bringing Victim 13 to Wheaton Regional Park, where he and other MS-13 members had dug a grave and, with others, he attacked the victim with a machete and knives until he was dead. *See* Plea Agreement, ECF No. 543 at 10.

- Similarly, in the same case, Judge Bredar sentenced Francisco Ramirez Pena to 300 months after he, too, admitted to participating in the racketeering conspiracy, as well as joining other MS-13 members in fatally stabbing with machetes and knives a woman believed to be a rival gang member. No. JKB-16-0259, ECF No. 552 at 10.

- And co-defendant Edwin Ruiz Urrutia also received a 300-month sentence for his participation in the RICO conspiracy and joining with Pena in killing the woman belied to be a rival gang member. No. JKB-16-0259, ECF No. 657.

15

In light of the sentences imposed in the cases above, Mr. Davis' history of complex trauma, and his experience of confinement during the Pandemic, the slightly below-guidelines sentence agreed to by the parties in this case is the sentence that is sufficient but not greater than necessary to meet the purposes of sentencing in this case. With credit for the two years he has already been in federal custody and assuming he receives the maximum amount of good-time credit, Mr. Davis will be around 55 years old when he is released—an age at which the likelihood of recidivism goes down substantially. U.S.S.C., *The Effects of Aging on Recidivism Among Federal Offenders* Fig. 15 (Dec. 2017), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20171207_Recidivism-Age.pdf (showing the rate of re-incarceration of those who were released between the ages of 55 to 59 is 9 percent).

## CONCLUSION

Mr. Davis asks the Court to sentence him to 300-months incarceration followed by a three-year period of supervised release. He further asks the Court to recommend that the Bureau of Prisons designate him to a facility that is within a 500-mile radius of his mother's home in Maryland, PSR ¶ 68 (listing the address), and that offers vocational training and apprenticeships in plumbing.

Respectfully submitted,

James Wyda
Federal Public Defender
  for the District of Maryland

_____/s/_____
Katherine Newberger
Christian Lassiter
Assistant Federal Public Defenders
100 South Charles Street
Tower II, 9th Floor

Baltimore, Maryland 21201
Telephone: (410) 962-3962
Facsimile: (410) 962-0872
Katherine_Newberger@fd.org
Christian_Lassiter@fd.org

_____/s/_____
Michael E. Lawlor
Brennan, McKenna & Lawlor, Chtd.
6305 Ivy Lane, Suite 700
Greenbelt, Maryland 20770
Telephone: (301) 474-0044
Facsimile: (301) 474-5730
mlawlor@verizon.net